<u>**AFFIDAVIT IN SUPPORT OF AN**</u>
<u>**APPLICATION UNDER RULE 41 FOR A**</u>
<u>**WARRANT TO SEARCH AND SEIZE**</u>

I, Elisha L. Morris, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices (cellphones), which are more particularly described below in Attachment A (incorporated herein). The cellphones, a silver Apple iPhone in a clear case and a blue Samsung cellphone in a blue case, are currently in law enforcement's possession. This application seeks authority to extract electronically stored information described in Attachment B (incorporated herein) from these electronic devices.

2.      I have been employed as a Police Officer with the Kentucky State Police since graduating the Police Academy in Frankfort, KY in 2004. I was deputized as a Task Force Officer with the DEA in 2016.  I am currently assigned to the Louisville, Kentucky Field Division as a member of the Financial Investigations Group (FIG). I am authorized and have the responsibility to investigate and arrest persons for violations of federal law, including, but not limited to, violations involving the unlawful distribution of drugs, (21 U.S.C. § 841(a)(1)), attempt and conspiracy to commit the same (21 U.S.C. § 846), money laundering (18 U.S.C. § 1956 and 1957), and various firearms offenses (18 U.S.C. § 924(c)).This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

1

3.      I have participated in numerous drug investigations, including international narcotics smuggling operations; illegal Internet narcotics sales; narcotics-related money laundering; and possession and distribution of cocaine, heroin, methamphetamine, fentanyl and other drugs.  I have debriefed defendants, cooperating individuals, and witnesses who, from their personal knowledge, related how they amassed, spent, converted, transported, distributed, and concealed the proceeds of their unlawful drug trafficking. I have received training in narcotics investigations, money laundering, Internet investigations, and asset seizures.  In my capacity as a DEA Task Force Officer, I am authorized to apply for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure.

4.      I know, based on my knowledge, training, experience, and participation in other investigations, and consultations with other experienced investigators, that drug traffickers commonly use electronic devices to aid them in their drug trafficking and money laundering activities.  This equipment includes, but is not limited to, cellular telephones, digital display pagers, electronic telephone books, electronic date books, computers, money counters, electronic surveillance equipment, eavesdropping equipment, and portable communication devices, including MiFi hotspots. These electronic devices often utilize other downloaded "applications" to facilitate communications to similar "applications" on other devices.

5.      Based on my knowledge, training, and experience, and consultation with other experienced investigators, I know that members of drug trafficking organizations and money laundering organizations (DTOs/MLOs) frequently use electronic devices to communicate about the business of distributing drugs, including coordinating meetings for exchanges of drugs and money.  These electronic devices can include, and are not limited to, cellular telephones, computers, PDAs, i-Pods, and other items.  Further, based on my knowledge, training, and

experience, I know that these devices often contain phone numbers, contact information, and electronic communications (emails, text messages, instant messages, third party applications etc.) of members of the DTOs/MLOs.  I know that these individuals sometimes take photos or videos of themselves or others with drugs, drug proceeds, and/or weapons, and store these photos/videos on their communication devices, including cellphones.  Accessing the information described above is critically important for law enforcement to be able to identify members of the DTOs/MLOs and understand the DTOs/MLOs full scope of operation.

6.      I know based on my knowledge, training, experience, and consultation with legal counsel, that it is a violation of 18 U.S.C. § 1956(h) to engage in a conspiracy to commit money laundering offenses.

7.      This affidavit is based on my personal knowledge and involvement in the investigation, and from information I have received from other persons involved in the investigation, including DEA Special Agents and Task Force Officers (TFOs) and members of the Kentucky State Police (KSP).

8.      The information contained in this affidavit is not a complete account of everything known to me about this case. Rather, it contains only the facts that I believe are sufficient to support a finding of probable cause to support the requested search warrants.

## **<u>IDENTIFICATION OF THE DEVICE TO BE EXAMINED</u>**

9.      I request permission to search the following electronic devices that were seized by law enforcement:

a.   A silver Apple iPhone in a clear case seized from the person of Jose Manuel MARTINEZ-Gomez during his arrest at the Salt Lake City International Airport in Salt Lake City, Utah on May 5, 2024.

b.   A blue Samsung cellular smartphone in a blue case seized from the pants pocket of blue jeans located in a suitcase belonging to Jose Manuel MARTINEZ-Gomez, or a family member of his, at the Salt Lake City International Airport, Salt Lake City, Utah on May 5, 2024.

10.    Both devices are currently located at the DEA's Lexington Resident Office in Lexington, KY.

11.    The applied-for warrant would authorize the forensic examination of both devices for the purpose of identifying electronically stored data, more particularly described in Attachment B.

**<u>PROBABLE CAUSE</u>**

12.    In January 2022, the Financial Investigations Group (FIG) with DEA's Lexington Resident Office (LRO) began investigating Jose Manuel MARTINEZ-Gomez, aka Meno. DEA agents received information that MARTINEZ-Gomez was working on behalf of the Cartel Jalisco Nueva Generación (CJNG), and other DTOs, to arrange for the collection of bulk cash drug proceeds in the United States, and to coordinate the repatriation of those proceeds to the DTOs in Mexico. These agreements are typically referred to as "money contracts." Once MARTINEZ-Gomez accepted a money contract on behalf of the DTO, he would then offer that contract to a broker in the United States who could arrange for the collection of the bulk cash in

the United States from the drug-side distributors. For brokering these contracts, MARTINEZ-Gomez would receive a commission based on the amount of money involved in the transaction.

13.    DEA's investigation included the insertion of an agent working in an undercover capacity (UC). The UC, acting as a broker in the United States, began to accept money contracts directly from MARTINEZ-Gomez. The UC communicated with MARTINEZ-Gomez through an encrypted application, WhatsApp.  The phone number utilized by MARTINEZ-Gomez during all these communications, from January 2022 until April 2024, was 52-33-1135-6552. I know that the "52" code is the country code for Mexico, meaning that the number is either associated with a mobile phone or a landline phone connected to Mexico.

14.    Once the bulk cash was picked up in the United States, it would typically be deposited into a bank account. Once deposited, MARTINEZ-Gomez (like other Mexico-based brokers) would coordinate and direct the transfer of the money, or its equivalent value, to specified cryptocurrency wallets or to bank accounts.

15.    From January 2022 to April 2024, the UC received and completed 67 money contracts or pick-ups throughout the United States on behalf of MARTINEZ-Gomez.  The total amount of money picked up during this time was $5,555,349.00 in bulk United States currency (USC).

16.    On Friday, May 3, 2024, I testified before a federal grand jury in the Eastern District of Kentucky, in Lexington, in support of money laundering charges against MARTINEZ-Gomez. The grand jury returned an indictment which charged MARTINEZ-Gomez with one count of conspiracy to commit money laundering offenses in violation of 18 U.S.C. §

1956(h) and two counts of concealment money laundering in violation of 18 U.S.C. §

1956(a)(1)(B)(i).

17.     Also on May 3, 2024, I was notified that MARTINEZ-Gomez, who is a resident

and citizen of Mexico, would be traveling to the United States.  The information provided to

DEA was that MARTINEZ-Gomez would be flying form Guadalajara, Mexico to Salt Lake City,

Utah on May 5, 2024.  Lexington DEA then notified DEA's Salt Lake City District Office

(SLCDO) that MARTINEZ-Gomez would be traveling to their district and requested assistance

in coordinating MARTINEZ-Gomez's arrest with Customs and Border Patrol (CBP). Your

affiant traveled to Salt Lake to effectuate the arrest.

18.     On May 5, 2024, at approximately 5:45 p.m. (mountain time), MARTINEZ-

Gomez's flight arrived at the Salt Lake City International Airport.  At approximately 6:30 p.m.,

MARTINEZ-Gomez, his wife and minor child proceeded through customs and were sent to

secondary inspection.  MARTINEZ-Gomez provided CBP with his Mexican Passport and United

States of America Visa/Border Crossing Card as identification. He also self-identified as Jose

Manuel MARTINEZ-Gomez.  MARTINEZ-Gomez was arrested on the indictment warrant out

of the Eastern District of Kentucky.  One cellphone, the silver iPhone, was located on

MARTINEZ-Gomez's person.   A second cellphone, a blue Samsung cellphone in a blue case,

was found in luggage belonging to MARTINEZ-Gomez and/or his family members. This second

phone was in a pocket in a pair of pants that appeared to belong to the juvenile male son. Both

MARTINEZ-Gomez and his wife, Blanca Estela VALDIVIA-Orozco, advised that the blue

Samsung cellphone belonged to MARTINEZ-Gomez.

19.     With the assistance of a Spanish language interpreter, I conducted an interview of MARTINEZ-Gomez.  I asked MARTINEZ-Gomez if the iPhone belonged to him, and he stated "yes." MARTINEZ-Gomez also claimed ownership of the second phone, the blue Samsung cellphone. I asked MARTINEZ-Gomez why he had two cellphones, and he stated that he used both phones "for business."  MARTINEZ-Gomez advised that he owned a seafood restaurant in Guadalajara. MARTINEZ-Gomez declined to consent to a search of his phones. He did, however, request that agents allow him to access the silver iPhone to retrieve three phone numbers from the phone before he was transported to jail. DEA Salt Lake City Special Agent (SA) Brittany Brzuszkiewicz assisted MARTINEZ-Gomez with his request. MARTINEZ-Gomez unlocked the phone himself by entering the passcode and Agent Brzuszkiewicz wrote down phone numbers for three of his contacts, to include his wife and two other individuals. Agents did not search the phone themselves.

20.     To ascertain whether either of these phones had the target phone number of 52-33-1135-6552, I requested that another DEA officer send a text message to this phone number via WhatsApp. On the locked screen for the silver iPhone, I saw the text message sent by the DEA officer.

21.     I seized both cellphones, the silver iPhone and the blue Samsung, and provided MARTINEZ-Gomez with a DEA form for receipt of evidence / property.

22.     On the back of the blue Samsung cellphone smartphone there was a sticker which appears to be from a cellphone repair shop.



 A Spanish-speaking DEA officer has advised me that "Reparation de Celulares & Relojeria" is translated to English as "Cellphone and Watch Repair."  The name and number for the cellphone owner, or the contact person, is Manuel Martinez with phone number 3311356552. The phone number is hand-written on the sticker two times. This is the same phone number utilized by

MARTINEZ-Gomez when communicating with the UC, and the phone number associated with
the silver iPhone in MARTINEZ-Gomez's actual possession.

23.     While still at the Salt Lake City Airport, and with the aid of a Spanish-language
interpreter, I then conducted an interview with Blanca Estela VALDIVIA-Orozco, the wife of
MARTINEZ-Gomez.  I advised VALDIVIA-Orozco of her *Miranda* rights, and she voluntarily
waived her rights.  During the course of the interview, VALDIVIA-Orozco stated MARTINEZ-
Gomez "exchanged money with friends."  VALDIVIA-Orozco stated she didn't know how much
money MARTINEZ-Gomez would exchange.  I asked VALDIVIA-Orozco if she knew what
MARTINEZ-Gomez did with the money he exchanged, and she stated "no."  I asked
VALDIVIA-Orozco if she knew how much money MARTINEZ-Gomez made from conducting
the exchanges. She stated that she didn't know but didn't think that it was very much, at least
from her understanding.  VALDIVIA-Orozco stated she didn't know who MARTINEZ-Gomez
exchanged money with.  I showed VALDIVIA-Orozco the two phones that were seized (the
silver iPhone from MARTINEZ-Gomez's person and the blue Samsung smartphone found in a
suitcase). I held up both phones for VALDIVIA-Orozco to view and asked her which phone
MARTINEZ-Gomez used to exchange money with his friends. VALDIVIA-Orozco pointed to
the blue Samsung smartphone and advised that it was that phone.

24.     The devices, a silver iPhone and a blue Samsung cellphone, are currently in the
lawful possession of the DEA. I seized the devices from MARTINEZ-Gomez at the Salt Lake
City International Airport.  The devices are currently in evidence storage at DEA's Lexington
Resident Office in Lexington, Kentucky.  In my training and experience, I know that the devices
have been stored in a manner in which their contents are, to the extent material to this

investigation, in substantially the same state as they were when the devices first came into the possession of the DEA.

25.     Cellular telephones are often utilized as a method communication between members of a Money laundering organization (MLO).  Based on my knowledge, training, and experience, and consultations with other experienced investigators, I know that the device such a Apple iPhone hold electronic stored information sought in this warrant, including call history (both incoming and outgoing), voicemail, photographs, videos, internet browsing history, and electronic communications (both emails and text messages) and electronic data (files, documents, records, etc.) and communications from other electronic "applications" installed on these devices.

26.     Based on my knowledge, training and experience, and consultation with other law enforcement personnel, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

10

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. Digital tablet:  A digital tablet, or tablet, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some tablets also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  Tablets usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most tablets run computer software, giving them many of the same capabilities as personal computers.  For example, tablets users can work with word-processing documents, spreadsheets, and presentations.  Tablets may also include global positioning system ("GPS") technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

12

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h. External hard drive:  A hard drive is a computer component that holds data. Every computer needs at least one hard drive to store its operating system, programs and user information. This drive usually is internal, or built into the computer, but as computer systems have evolved and different needs, threats and circumstances have arisen, external hard drives have become more popular. External hard drives usually are used in addition to internal hard drives in order to store more data. They also allow the user to put sensitive, confidential or otherwise important

13

information on them, then disconnect them and store them in secure locations. An external hard drive sits outside the main computer tower in its own enclosure. This portable encasement is slightly larger than the hard drive itself, and it sometimes contains a cooling fan. The external hard drive is connected to the computer via an interface cable, which allows the external hard drive to communicate with the computer so that data can be passed back and forth.

i.  SIM card:  A Subscriber Identity Module (SIM) card is a portable memory chip used mostly in cell phones that operate on the Global System for Mobile Communications (GSM) network. These cards hold the personal information of the account holder, including his or her phone number, address book, text messages, and other data. When a user wants to change phones, he or she can usually easily remove the card from one handset and insert it into another.

j.  Memory card:  Memory cards are used for the storage of various types of electronic data. Sometimes referred to as a flash memory card, the standard card is capable of storing a wide range of data files, such as audio and video clips, images, and text documents. In general, these cards have a high amount of capacity, which makes them ideal for storing larger data files.

k.  Personal MiFi spot: A personal WiFi hotspot is a portable bubble of Internet connectivity that can be used on the go to connect up to five devices. The personal WiFi hotspot is created by a battery-operated, pocket-sized, miniature router compliant with cellular broadband standards. Products with compatible wireless modems or adapters, such as cellular telephones, can jump on the network to collect mail, stream videos or just surf the Web. The advantage of a personal

14

WiFi® hotspot is that it can be created anywhere within the carrier's broadcasting range. Networks created by portable cellular routers are encrypted with Wi-Fi Protected Access (WPA).

27.     In my training and experience, examining data stored on the device listed above can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Additionally, such a device may provide relevant information about other MLO/DTO members, their specific roles within the organization, and evidence which may be used in their prosecution. Specifically, the requested information would allow investigators to confirm the telephone numbers and/or messages with whom MARTINEZ-Gomez was in contact regarding money laundering contracts. Based on my knowledge, training, and experience, and consultation with other law enforcement personnel, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.     I believe there is probable cause to believe that things that were once stored on the devices seized may still be stored there, for at least the following reasons:

Based on my knowledge, training, and experience, I know that computer files/telephone files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or cellular telephone, the

data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  In the case of the wireless telephone devices with Internet access, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may

17

depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

I know that when an individual uses an electronic device to call a potential witness in an attempt to have the witness obstruct justice, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

30.    Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the devices described in Attachment A to seek the items

described in Attachment B. The silver iPhone was used by MARTINEZ-Gomez to commit

money laundering offenses, including his communications with an undercover DEA officer, and

the phone was in his actual possession incident to his arrest. The blue Samsung cellphone was

claimed by MARTINEZ-Gomez as his phone and one of two phones that he used to conduct

business. The Samsung phone was in his constructive possession. MARTINEZ-Gomez's wife

admitted to me that MARTINEZ-Gomez used the blue Samsung phone to communicate with

unknown other individuals when "exchanging money."

Respectfully submitted,

/s/ Elisha L. Morris_____
Task Force Officer
DEA

Transmitted via email and attested to by email in accordance with the requirements of
Fed. R. Crim. P. 4.1 on this _5_ day of __June__, 20 24 .

_____
Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE